STATE OF CONNECTICUT *v.* JOHN BRONSON, SR.
(AC 16833)

Lavery, Landau and Schaller, Js.

Argued April 19—officially released November 16, 1999

*Douglas Morabito* and *Anthony Saraco*, certified legal interns, with whom were *Susan M. Hankins*, assistant public defender, and, on the brief, *Thomas West* and *David DeRosa*, certified legal interns, for the appellant (defendant).

*Toni M. Smith-Rosario*, deputy assistant state's attorney, with whom, on the brief, were *Patricia A. Swords*, state's attorney, and *Elizabeth C. Leaming*, assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, John Bronson, Sr., appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (A) and risk of injury to a child in violation of General Statutes (Rev. to 1993) § 53-21. The defendant claims that the trial court improperly (1) denied (a) his motion for a continuance to prepare for a hearing on whether to videotape the testimony of the victim pursuant to General Statutes § 54-86g, (b) granted the state's motion to videotape the victim's testimony, (c) denied his motion for a court-ordered expert examination of the victim and (d) denied his motion for a mistrial, (2) precluded the testimony of defense character witnesses not disclosed prior to trial and (3) denied his motion to redact a portion of a videotaped interview with the victim that was conducted nearly two years before trial. We affirm the judgment of the trial court.

The following facts are relevant to our disposition of this appeal. From September through November, 1994, the defendant's daughter-in-law left her four year old daughter, M, and her one and one-half year old son, A, with the defendant and his wife, the children's grandparents, while she went to work part-time. When the defendant and his wife took care of the children, the children would spend the prior night with them.

On or about November 10, 1994, when M's mother came to the grandparents' house to take the children home, the defendant's wife told M's mother that M had wet her pants while playing. M's mother decided to wait until she got home to change M. She gave both A and M baths. While drying M, she noticed that M's vaginal area was red and puffy, and asked what was wrong with her "pee-pee." M responded that she did not know, but when asked if someone had touched her there, M responded, "Yes." When M's mother asked who had touched her, M responded that the defendant had touched her.

Elaine Yordan, a physician, examined M on November 21, 1994. Yordan found that M's vaginal area was normal and noted that her finding was not inconsistent with M's statement. The next day, Diane Edell, program coordinator and interviewer at the child abuse diagnostic center at Saint Francis Hospital and Medical Center, interviewed M. That interview was videotaped. M stated that the defendant had touched her "pee-pee" with his hand while they were lying on a couch. Additional facts will be set forth where necessary.

## I

The defendant claims that the trial court improperly (1) denied his motion for a continuance to prepare for a midtestimony hearing pursuant to § 54-86g,[1] (2)

---

[1] General Statutes § 54-86g (a) provides in relevant part: "In any criminal prosecution of an offense involving assault, sexual assault or abuse of a child twelve years of age or younger, the court may, upon motion of the attorney for any party, order that the testimony of the child be taken in a room other than the courtroom in the presence and under the supervision of the trial judge hearing the matter and be . . . recorded for later showing before the court. . . . [T]he court may order the defendant excluded from the room or screened from the sight and hearing of the child only if the state proves, by clear and convincing evidence, that the child would be so intimidated, or otherwise inhibited, by the physical presence of the defendant that a compelling need exists to take the testimony of the child outside the physical presence of the defendant in order to insure the reliability of such testimony. If the defendant is excluded from the room or screened from

granted the state's motion to videotape M's testimony, (3) denied the defendant's motion to have a court-ordered expert examine M and (4) denied his motion for a mistrial. We disagree.

The following additional facts are necessary for our resolution of these claims. The state called M as a witness on Friday morning, September 13, 1996. During direct examination, after answering approximately 100 questions, M broke down on the witness stand and began to cry when asked about the details of the assault.[2] The court declared a recess. The victim's advocate, Linda Heslin, in the presence of the jury, picked

the sight and hearing of the child, the court shall ensure that the defendant is able to observe and hear the testimony of the child, but that the child cannot see or hear the defendant. The defendant shall be able to consult privately with his attorney at all times during the taking of the testimony. The attorneys and the judge may question the child. . . ."

[2] The testimony that led up to M's breakdown on the stand was as follows.

"[Prosecutor]: Does the grandpa have a beard and moustache, the one that we're talking about?

"[M]: Yes.

"Q. Okay. And you said you played the game called Rex with this—

"A. Yes.

"Q. And why do you call him the bad grandpa?

"A. I don't know.

"Q. Is that how you feel?

"A. Yes.

"Q. Do you have another grandpa?

"A. Yes.

"Q. Okay. And what do you call him?

"A. Grandpa.

"Q. When you played the game called Rex with your other grandpa, the one that's in the courtroom today, whose name was Rex?

"A. The bad grandpa.

"Q. Do you remember what your name was when you played that game?

"A. No.

"Q. Did you have a special name?

"A. No.

"Q. Can you tell us what happened when you played the game called Rex with the bad grandpa?

"A. Yes.

"Q. Okay. Why don't you tell us.

"A. My private.

up M and removed her from the courtroom.[3] The court later recalled the jury and stated: "Ladies and gentlemen, it has become clear to us that we're not going to be able to resume the testimony at this point, at least not until after lunch." When court resumed that afternoon, the state's attorney made a motion for a hearing pursuant to *State* v. *Jarzbek*, 204 Conn. 683, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988), to allow the state to videotape the remainder of M's testimony outside the presence of the defendant pursuant to § 54-86g. The defendant received the state's motion at 1:57 p.m. on Friday afternoon. The defendant requested a continuance until the next court session, the following Tuesday morning, so that he could review the relevant law.[4] The court denied the defendant's motion and held the hearing required by § 54-86g that afternoon. Additional facts will be set forth where necessary.

## A

The defendant claims that the trial court improperly denied his motion for a continuance to prepare for the *Jarzbek* hearing. We disagree.

"Q. What about your private? Did something happen to it?

"A. Yes.

"Q. Can you tell us what happened to it? You can take your time.

"A. No.

"Q. You don't want to tell us? Did any part of grandpa's—Did any part of grandpa touch your private? . . .

"A. Yes.

"Q. What part of his body touched your private, [M]?

"A. His hand.

"Q. When grandpa's hand touched your private, did it touch you on your private or was it on the inside of your private?

"A. I can't remember.

"Q. Okay. That's okay. Can you tell us what it felt like when he touched you on your private? (At this time, [M] started to cry.) Do you want to take a break?"

[3] Neither party argues that the action of the victim's advocate in removing M from the stand was improper.

[4] Defense counsel stated: "My review of the case law over the luncheon recess indicates there has to be an evidentiary hearing, and I see that as

"Appellate review of a trial court's denial of a motion for a continuance is governed by an abuse of discretion standard that, although not unreviewable, affords the trial court broad discretion in matters of continuances." (Internal quotation marks omitted.) *State* v. *DeCaba*, 42 Conn. App. 141, 143, 679 A.2d 35, cert. denied, 239 Conn. 915, 682 A.2d 1008 (1996). It is not appropriate for us to decide whether we, as trial judges, would have reached a different result, but, rather, whether the trial court abused its discretion in denying the continuance.

"In appellate review of matters of continuances, federal and state courts have identified multiple factors that appropriately may enter into the trial court's exercise of its discretion. Although the applicable factors cannot be exhaustively catalogued, they generally fall into two categories. One set of factors focuses on the facts of record before the trial court at the time when it rendered its decision. From this perspective, courts have considered matters such as: the timeliness of the request for continuance; the likely length of the delay; the age and complexity of the case; the granting of other continuances in the past; the impact of delay on the litigants, witnesses, opposing counsel and the court; the perceived legitimacy *of the reasons proffered in support of the request*; the defendant's personal responsibility for the timing of the request; the likelihood that the denial would substantially impair the defendant's ability to defend himself; the availability of other, adequately equipped and prepared counsel to try the case; and the adequacy of the representation already being afforded to the defendant. . . . Another set of factors has included, as part of the inquiry into a possible abuse of discretion, a consideration of the prejudice that the defendant *actually suffered* by reason of the denial of the motion for continuance. . . . For purposes of

allowing me to present testimony, and I would like a continuance until Tuesday to prepare for this, prepare for the evidence . . . ."

assessing actual prejudice, the focus is on the adequacy of the defendant's legal representation subsequent to the trial court's ruling, as distinguished from its likely adequacy as determined by the trial court at the time of its ruling on the motion for continuance." (Citations omitted; emphasis added.) *State* v. *Hamilton,* 228 Conn. 234, 240–41, 636 A.2d 760 (1994).

The court heard argument from the state and defense counsel regarding the motion for continuance:

"[Defense Counsel]: I'd ask for a continuance to allow me to address this motion. . . . I would like a continuance until Tuesday to prepare for this, prepare for evidence, and I may make a motion to have the child examined by an expert. And for those reasons, I would ask the court for a continuance until Tuesday to prepare for the hearing.

\* \* \*

"What I'm saying is this has surprised all of us after two years, and I guess I'm asking for time to prepare for this evidentiary hearing. I think it's only fair to the defendant after the surprise that we've had this morning.

"The Court: It shouldn't affect your ability to proceed with the case. Whether I grant the motion or not, you still have the same rights that you do of confrontation— the right to cross-examine [M] and to question her. The only difference would be, if I grant the motion, that the testimony is taken outside the presence of the defendant, but he can also hear and watch the testimony that's being presented. So, I don't know that there'd be any great prejudice to you from granting this.

"[Defense Counsel]: Well, there's great prejudice in this case because of the fact that we've already had [M] in court, seen by the jury, and now the state wants to

take her outside and have the examination done outside. I think this is the worst possible situation that the defense could be in. I think that if this had been done pretrial it would have been even different than it is now. But, for us, it's the worst situation that could possibly happen. And that's not the issue. The issue is to be prepared for this evidentiary hearing, and I'm asking for—it's now Friday afternoon. I guess I'm just asking until the next court session to prepare.

\* \* \*

"[Prosecutor]: I don't see how a lot is going to change from this afternoon to Tuesday morning.

"[Defense Counsel]: Well, a lot would change in terms of my ability to have time to read the case law and to determine what exactly the issues are and what the cases have said. . . .

"[Prosecutor]: Your Honor, I would have no objection to defense counsel having some time to read through the case law. . . . I could provide a copy to him.

"The Court: I just don't know what a continuance is going to do here. The state does have the burden actually of proving this, [its] request, [its] motion, and it's not based on—It's based on what happened here in the courtroom primarily, which we all were a party to. There are not going to be any other expert witnesses testifying. . . . Let me do this. I'm going to take—we'll take a short recess. I'd like to see counsel in chambers for a moment. We'll take a short recess and I'll talk to counsel.

\* \* \*

"[Defense Counsel]: I object to hearing the motion. I move for a continuance so that I can prepare for this evidentiary hearing. I haven't had a chance to do any legal research in the matter. I have not had a chance

to even talk to—Well, I talked to [a potential expert witness] just for thirty seconds before you came into court after our conference. I haven't had a chance to even talk to her about what she might say if called to testify.

"The Court: *Well, I'll give you a chance to talk to her if you want that, but*—

"[Defense Counsel]: . . . I'm asking for a continuance of this matter until 10 a.m. so I can better prepare for this hearing and prepare any motions that I feel [are] appropriate." (Emphasis added.)

In his argument for the continuance, the defendant failed to point to any reasons why he might need it other than to read the relevant case law. The state offered to supply the defendant with copies of the cases, and the court did take a recess shortly thereafter. Whether the defendant received copies of the case law from the prosecutor is not revealed by our review of the transcripts and we will not speculate as to whether he did. When court reconvened after the recess and chambers conference, defense counsel stated that he did not have adequate time to discuss the situation with his expert. The court *then offered defense counsel additional time* to speak to his expert, but the offer went unanswered. Instead, defense counsel merely repeated his objection and moved again for a continuance.

The defendant claims that any possible delay the continuance would have caused was de minimis, only three hours of the court's time. We agree that the continuance requested was not burdensome. The state's argument that the continuance sought amounted to a four day delay in the proceedings is not relevant. What is significant, however, is that the defendant failed to articulate to the court any meaningful reasons for his

request. The prosecutor stated that the evidentiary hearing would be based primarily on M's actions in the courtroom earlier in the day. Defense counsel was granted extra time to consult with his expert, but he refused the offer.

Additionally, the defendant did not argue to the court that a failure to grant the continuance would prejudice his client. The only prejudice claimed was that the jury had seen M break down on the stand and the resulting opportunity for the state to examine her outside the defendant's presence. This claim of prejudice does not relate to the denial of the continuance request, but rather to the heart of whether the court properly could allow the videotaping of M's testimony pursuant to § 54-86g.

The defendant now claims, on appeal, that he was denied effective assistance of counsel by the trial court's denial of a continuance and cites *Powell* v. *Alabama*, 287 U.S. 45, 53 S. Ct. 55, 77 L. Ed. 158 (1932), to support his contention that his trial counsel did not have sufficient time to prepare. We agree with Justice Sutherland's classic statement in that case that "[t]he prompt disposition of criminal cases is to be commended and encouraged. But in reaching that result a defendant, charged with a serious crime, must not be stripped of his right to have sufficient time to advise with counsel and prepare his defense. To do that is not to proceed promptly in the calm spirit of regulated justice but to go forward with the haste of the mob." Id., 59. The defendant in the present case, however, was not deprived of time to consult with his attorney. As we noted, defense counsel failed to articulate any meaningful reasons for needing a continuance. The state did not produce any expert testimony at the hearing, but presented only two witnesses who testified about their observations of M immediately after her

breakdown. The defendant's claim of prejudice before us now does not carry weight in light of these events.

The defendant also claims that he was not afforded a meaningful hearing on the *Jarzbek* motion as required by *State* v. *Marquis*, 241 Conn. 823, 699 A.2d 893 (1997). We are not persuaded.

Our Supreme Court has stated: "If the defendant is entitled to a hearing on the state's motion for videotaped testimony, he is entitled to have the trial court ensure that such a hearing is meaningful because, as we recognized in *Jarzbek*, the hearing on the motion serves to protect 'the right of an accused to confront witnesses against him as guaranteed by the confrontation clause of both the federal and state constitutions.' " Id., 837. The Supreme Court did not define the nature of a "meaningful" hearing. We therefore look to the common meaning of the word. "Meaningful" is defined as "full of meaning; having significance or purpose." Webster's New World Dictionary (2d College Ed.).

Although the court denied the defendant's motion for a continuance, it did hold a hearing prior to the videotaping of M's testimony pursuant to § 54-86g. That hearing consisted of two witnesses who testified about M's state of mind immediately after her breakdown. The defendant cross-examined both witnesses. Although the court gave the defendant short notice that it was going forward with the *Jarzbek* hearing that day, it did not abuse its discretion in doing so. We note again that we do not review abuse of discretion issues based on whether we, as trial judges, would have reached a different conclusion. Rather, we must review the court's actions and determine whether it abused *its* discretion. We conclude that the hearing under § 54-86g was not rendered "meaningless" simply because the court did not grant the defendant's motion for a continuance.

Thus, the court did not abuse its discretion in denying the defendant's motion.

## B

The defendant next claims that the trial court improperly granted the state's motion to videotape M's testimony.[5] We are not persuaded.

The primary concern when a court determines whether to allow a witness' testimony to be videotaped is the effect on the defendant's sixth amendment right to confront his accuser. The United States Supreme Court addressed the confrontation issue in *Coy* v. *Iowa*, 487 U.S. 1012, 108 S. Ct. 2798, 101 L. Ed. 2d 857 (1988). In *Coy*, the court recognized that the right of confrontation had "a lineage that traces back to the beginnings of Western legal culture. There are indications that a right of confrontation existed under Roman law. The Roman Governor Festus, discussing the proper treatment of his prisoner, Paul, stated: 'It is not the manner of the Romans to deliver any man up to die before the accused has met his accusers face to face, and has been given a chance to defend himself against the charges.' Acts 25:16." Id., 1015–16. In *Coy*, a large screen was placed between the victims and the defendant so that the victims could not see the defendant and the defendant could only see a silhouette of the victims. Id., 1014–15. The Supreme Court, while reversing the defendant's conviction on the basis of a confrontation clause violation, did reserve for a later date the question of what exceptions to the confrontation clause might exist. The court held: "Since there have been no individualized findings that these particular witnesses needed special protection, the judgment here could not be sustained by any conceivable exception." Id., 1021.

[5] We note that the dissent does not specifically object to our upholding the court's decision granting the state's motion to videotape M's testimony.

The court revisited the confrontation clause in *Maryland* v. *Craig*, 497 U.S. 836, 840, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990), in which the state sought to present the testimony of a child witness by way of closed circuit television. A Maryland statute allowed for such a proceeding after a finding by the trial judge that "testimony by the child victim in the courtroom will result in the child suffering serious emotional distress such that the child cannot reasonably communicate." (Internal quotation marks omitted.) Id., 841. In *Craig*, the court stated that "[w]e have never held, however, that the Confrontation Clause guarantees criminal defendants the *absolute* right to a face-to-face meeting with witnesses against them at trial." (Emphasis in original.) Id., 844. "In sum, our precedents establish that the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial . . . a preference that must occasionally give way to considerations of public policy and the necessities of the case . . . ." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 849.

The rule in Connecticut for determining whether a child witness' testimony in sexual assault cases may be videotaped is set forth in *State* v. *Jarzbek*, supra, 204 Conn. 704, in which our Supreme Court stated: "[I]n criminal prosecutions involving the alleged sexual abuse of children of tender years, the practice of videotaping the testimony of a minor victim outside the physical presence of the defendant is, in appropriate circumstances, constitutionally permissible. Our holding that appropriate circumstances may warrant a departure from strict compliance with confrontation requirements does not, however, signal a relaxation of the underlying evidentiary requirement that *appropriate circumstances be proven to exist*. We emphatically reject the proposal . . . that, in every case allegedly involving the sexual abuse of children, we should presume that the credibility of a minor victim's

testimony will be improved by excluding the defendant from the witness room during that witness's testimony. *There is no constitutional justification for automatically depriving all criminal defendants of the right of physical confrontation during the videotaping of a minor victim's testimony.* We instead mandate a case-by-case analysis, whereby a trial court must balance the individual defendant's right of confrontation against the interest of the state in obtaining reliable testimony from the particular minor victim in question. See *Globe Newspaper Co.* v. *Superior Court*, [457 U.S. 596, 609 and n.25, 102 S. Ct. 2613, 73 L. Ed. 2d 248 (1982)]." (Emphasis added.) To satisfy its burden, "the state must show that the minor victim would be so intimidated, or otherwise inhibited, by the physical presence of the defendant that the trustworthiness of the victim's testimony would be seriously called into question. Furthermore, the state bears the burden of proving such compelling need by clear and convincing evidence." *State* v. *Jarzbek*, supra, 704–705; see *State* v. *Bonello*, 210 Conn. 51, 554 A.2d 277, cert. denied, 490 U.S. 1082, 109 S. Ct. 2103, 104 L. Ed. 2d 664 (1989) (affirming *Jarzbek* standards as providing sufficient measures to protect defendant's confrontation right).[6]

---

[6] We note that in 1996, after the defendant's trial, article first, § 8, of the constitution of Connecticut was amended by article twenty-nine of the amendments to the constitution of Connecticut. Amendment twenty-nine provides for *victims'* rights in criminal cases. It provides in relevant part that "a victim . . . shall have . . . (3) the right to be reasonably protected from the accused throughout the criminal justice process . . . ." We also note that this provision, while having no effect on the defendant's trial, apparently acknowledges a desire in society better to protect the victims of crimes from their attackers.

Our state constitution is a living, breathing document that must change to reflect the current ideologies of society, lest it become an idea, which like the Pony Express, has outlived its usefulness. "Constitutional provisions must be interpreted within the context of the times. See, e.g., *Weems* v. *United States*, 217 U.S. 349, 30 S. Ct. 544, 54 L. Ed. 793 (1910); *State* v. *Cannon*, 55 Del. 587, 594, 190 A.2d 514 (1963); *People* v. *Neumayer*, 405 Mich. 341, 365, 275 N.W.2d 230 (1979); *Wylie Bros. Contracting Co.* v. *Albuquerque-Bernalillo C. A. C. B.*, 80 N.M. 633, 639, 459 P.2d 159 (1969);

The court saw M's reaction to the defendant's presence when she began testifying about the assault. M was unable to regain her composure and had to be removed from the courtroom. Heslin testified at the *Jarzbek* hearing that M stated to her that she was scared. See footnote 8. Heslin testified that M stated that she would not be able to go back into the courtroom because of the defendant. M further told Heslin that she would be able to continue if questioning resumed with the defendant out of the room. M's father also testified as to M's condition immediately after being removed from the witness stand. He testified that M did not want to come back into the courtroom and "talk to all these people, and she specifically said, 'the bad grandfather.' " The father testified that he believed that M was not willing to discuss the events further with the defendant in the courtroom.

*Seattle School District* v. *State*, 90 Wash. 2d 476, 516, 585 P.2d 71 (1978). As one court said: 'We must *interpret* the constitution in accordance with the demands of modern society or it will be in constant danger of becoming atrophied and, in fact, may even lose its original meaning.' . . . *Seattle School District* v. *State*, supra [516]. It is this court's duty to assure that our constitution does not become 'a magnificent structure . . . to look at, but totally unfit for use.' *Gibbons* v. *Ogden*, 22 U.S. (9 Wheat.) 1, 222, 6 L. Ed. 23 (1824). Moreover, a constitution is, in Chief Justice John Marshall's words, 'intended to endure for ages to come, and, consequently, to be adapted to the various *crises* of human affairs.' . . . *M'Culloch* v. *Maryland*, 17 U.S. (4 Wheat.) 316, 415, 4 L. Ed. 579 (1819). . . . We agree. The Connecticut constitution is an instrument of progress, it is intended to stand for a great length of time and should not be interpreted too narrowly or too literally so that it fails to have contemporary effectiveness for all of our citizens." (Citations omitted; emphasis in original.) *State* v. *Dukes*, 209 Conn. 98, 114-15, 547 A.2d 10 (1988).

Because article twenty-nine of the amendments to the constitution of Connecticut was not adopted until November 27, 1996, after the defendant was convicted and sentenced, we will not discuss any possible ramifications this amendment might have on either the present case or future cases involving determinations pursuant to § 54-86g. Query, whether the child victim of sexual assault now has a constitutional right to have her testimony videotaped outside the presence of the defendant? Query, to what extent is the constitutional right of the defendant to face his accuser now balanced against the victim's constitutional right to be reasonably protected? We leave these questions for another day.

M indicated to both Heslin and her father that she would be willing to continue with her testimony with the defense counsel in the room. She also indicated that she would be willing to continue testifying in the presence of specified individuals whom she listed. The defendant was not included on that list.

The defendant argues that the videotaping of M's testimony only provided relief for M but "did not enhance the reliability of M's testimony . . . ." The defendant's argument misses the mark. The purpose of § 54-86g is to ensure that the court receives reliable testimony unhindered by the child's potential trauma at being placed in front of her alleged attacker. Nothing in the statute requires that videotaping a child victim's testimony must "enhance" its reliability. The court must determine only that the child is "so intimidated, or otherwise inhibited, by the physical presence of the defendant that a compelling need exists to take the testimony of the child outside the physical presence of the defendant in order to *insure* the reliability of such testimony. . . ." (Emphasis added.) General Statutes § 54-86g (a). In granting the state's motion to videotape the victim's testimony, the trial court ruled: "It's clear to this court that for whatever reason, she's not able to proceed, and the evidence satisfies the court that the state has proved by clear and convincing evidence that the child was not able to testify based on the court's own observation. . . . [I]t appears to me that the child would be intimidated or otherwise inhibited by the presence of the defendant, and therefore her testimony would be unreliable and seriously called into question simply because I don't think she'd be able to testify, just not able to, and that's the court's impression as well." A decision about "[t]he [ability] of a witness [to testify reliably] is a matter peculiarly within the discretion of the trial court and its ruling will be disturbed only in a clear

case of abuse or of some error in law." (Internal quotation marks omitted.) *State* v. *Marquis*, supra, 241 Conn. 836.

We conclude that the court's determination that the evidence was clear and convincing that the defendant's physical presence would have seriously compromised the reliability of M's testimony was legally and logically correct and is supported by the facts. The court properly granted the state's motion to videotape M's testimony.[7]

C

The defendant claims that the trial court improperly denied his motion to have a court-appointed expert examine M to determine if she could complete her testimony in the courtroom before ruling on the state's motion to videotape her testimony outside the courtroom. We disagree.

The decision to order expert examination of a child witness prior to videotaping her testimony pursuant to § 54-86g falls within the court's broad discretion to control discovery. Id., 837–38. We will reverse a court's ruling only if the court abused its discretion.

Our Supreme Court addressed the issue of requiring expert testimony for a *Jarzbek* hearing in *State* v. *Spigarolo*, 210 Conn. 359, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989). Our Supreme Court rejected the contention that expert testimony is necessary to establish the state's burden of proof in a *Jarzbek* hearing. "Nothing in *Jarzbek* indicates any such requirement. Indeed, such a requirement

---

[7] Our conclusion does not constitute a per se rule that automatically permits the videotaping of a child witness' testimony if she begins to cry or experience emotional distress on the witness stand in open court. We hold only that the court made a proper determination on the basis of the specific facts of the present case as required by § 54-86g.

would ignore the unusual and unfortunate circum-
stances of cases of sexual abuse of children." Id., 372.
Although *Spigarolo* addressed primarily the state's bur-
den of proof, portions of *Spigarolo* are helpful in decid-
ing whether the defendant is entitled to a court-
appointed expert to evaluate M's ability to testify in
front of the defendant: "The family or guardians of a
sexually abused child obviously occupy a unique posi-
tion to assess the mental and emotional impact of a
courtroom confrontation on the minor. We have no
doubt that the testimony of such individuals may pro-
vide critical insight on a minor's ability or inclination
to speak truthfully in the physical presence of an alleged
perpetrator." Id.

In this case, the state presented two lay witnesses,
M's father and Heslin, who testified that M was appre-
hensive about continuing her testimony in the presence
of the defendant, and that they believed M would be
better able to testify if the defendant were not in her
presence while she testified.[8] Neither M's father's nor

---

[8] Heslin testified as follows.

"[Prosecutor]: Did you speak with [M] after she testified?

"[The Witness]: Yes, I did.

"Q. And where was that?

"A. In the state's attorney's office.

"Q. Can you tell us what her demeanor was . . . ?

"A. For quite a while she was pretty upset, crying and sobbing . . . .

"Q. Do you recall what she was saying as she was sobbing?

"A. 'I want to go home.'

\* \* \*

"Q. Did you have the opportunity to speak with her alone?

"A. Yes, I did.

"Q. Do you recall what she said to you at that time?

"A. I asked her if she thought she'd be able to go back into the courtroom
for a little while longer and she said, 'No,' and started to get upset again.

"Q. Did you ask her why?

"A. Yes, I did.

"Q. And what did she say?

"A. She said, 'Because of him.'

"Q. And what did you say in response to that?

"A. I said to her that I needed to know who 'him' was, and she stated,
'The bad grandpa.'

Heslin's testimony was presented as expert testimony. In fact, the prosecutor specifically stated that she was not going to call any experts. This testimony supplemented the court's observations of M's difficulties on the stand.

The defendant cites *State* v. *Spigarolo*, supra, 210 Conn. 378, for the proposition that expert testimony

"Q. And did you ask her why she couldn't go in because of him, or the bad grandpa?

"A. Well, I asked her if it was because she was—because she felt that she was either mad, or scared, or what did she feel, and she said that she was mad and scared to go back in. She was mad at him and scared to go back in.

"Q. Okay. Did she say anything else at that time?

"A. I asked her if it would be better if we could go to a different room where there was no—where grandpa would not be, and she said, 'Yes, that would be better.'

"Q. Did she seem to indicate to you that she could talk about what happened to her if he was not present?

"A. She didn't specifically say that, but I said, 'If [the prosecutor], and [defense counsel], and the judge . . . and I went into a different room to talk would that be better?' and she said, 'Yes, that would be better.'

"Q. Based on what you observed of [M] and what she has told you, do you think that she would be able to testify in open court in front of the defendant?

"A. No."

M's father testified as follows.

"[Prosecutor]: Were you present in the courthouse when [M] came out of the courtroom after testifying this morning?

"[The Witness]: Yes, I was.

"Q. Were you able to observe her demeanor at that time?

"A. Yes.

\* \* \*

"Q. Okay, did you have an opportunity to speak with her alone?

"A. Yes, I did.

\* \* \*

"Q. Okay. Based on what you observed of [M] and what she told you, do you believe that she would be able to testify in court in the presence of the defendant?

"A. No, I don't.

"Q. Again, based on what you observed and what she told you, do you believe that her testimony would be more accurate if she were to testify outside the presence of the defendant?

"A. Yes."

is valuable under the circumstances. The defendant's reliance on this principle, however, is misplaced. While it is true that an expert's testimony on the issue of a victim's ability to testify in a defendant's presence might be helpful, expert testimony is not always needed. As we have noted, our Supreme Court has specifically stated that expert testimony is not a prerequisite to the state's meeting its burden of proof. It logically follows that a court-appointed expert evaluation is not required.[9]

The defendant, when requesting the continuance, stated that he "may make a motion to have [M] examined by an expert witness." At that time, however, he did not state that he intended that witness to be court appointed. In fact, the defendant waited until after the state had rested in the *Jarzbek* hearing to move for a court-appointed expert evaluation of M. The defendant argued at the *Jarzbek* hearing that because one witness stated that M said she was "scared" and the other stated

[9] Part II of the dissent concludes that the court improperly denied the defendant's motion for a court-ordered expert examination of M prior to videotaping her testimony. We respectfully note that the dissent does not mention *State* v. *Spigarolo*, supra, 210 Conn. 372, in which our Supreme Court rejected the argument that the state *needs* to put on expert testimony to meet its burden of proof in a *Jarzbek* hearing. The trial court is perfectly capable of determining whether the child can reliably testify in the defendant's presence based on lay witness testimony, especially in this case, where the court witnessed for itself M's emotional collapse while testifying in the defendant's presence.

The dissent points to the inconsistency between the conclusion reached by M's therapist before trial that M would be able to testify and the *Jarzbek* hearing testimony of Heslin and M's father that M could not continue testifying in the defendant's presence. We believe that the dissent focuses on the wrong point. At the *Jarzbek* hearing, the trial court heard testimony from two witnesses both of whom testified that M could not continue in the defendant's presence. There were no inconsistencies between those witnesses' testimonies. The fact that testimony at the *Jarzbek* hearing conflicted with M's therapist's previous conclusion reflects only a change in the conditions between the initial evaluation of M by the therapist and the observations of her by Heslin and her father after she was removed from the stand.

that M said she was "uncomfortable," M's mental state was unknown and, therefore, a court-ordered evaluation was necessary to "determine whether or not this child is able to testify or is not able to testify because she's merely uncomfortable or because she's intimidated by the defendant." Whether M was merely uncomfortable or intimidated is a question of fact, and it is the trial court's sole province to determine questions of fact in a *Jarzbek* hearing.

The court found: "Based on the information we had, there was no indication that [M] could not proceed with—apparently with the testimony in the presence of the defendant. . . . It's clear to this court that for whatever reason, she's not able to proceed, and the evidence satisfies the court that the state has proved by clear and convincing evidence that [M] was not able to testify based on the court's own observation. . . . It appears to me that [M] would be intimidated or otherwise inhibited by the presence of the defendant, and therefore her testimony would be unreliable and seriously called into question simply because I don't think she'd be able to testify, just not able to, and that's the court's impression as well."

Further persuasive support for the court's denial of the defendant's motion for a court-appointed expert evaluation of M is found in *State* v. *Ross*, 451 N.W.2d 231 (Minn. App.), cert. denied, 498 U.S. 837, 111 S. Ct. 109, 112 L. Ed. 2d 79 (1990). In *Ross*, a child sexual abuse victim began testifying in the presence of the defendant, but then balked when asked if she had ever been alone with him. Id., 234. The trial court found that the victim "would be psychologically traumatized and appeared to be so somewhat yesterday if there was effort or continued effort to have the youngster testify in the actual physical presence . . . of the defendant, versus the approach we're using here this morning. I think it's clear yesterday she was scared being in [the defendant's] presence." Id., 235. The trial court recessed

and allowed the victim's testimony to continue via closed circuit television, with the victim and the defendant separated. Id., 234. Minnesota Statutes § 595.02[10] allows for child testimony outside the presence of the defendant much like § 54-86g. The Minnesota statute requires "a 'particularized finding' that a procedure shielding the child from face-to-face confrontation is necessary to prevent traumatization." Id., 235. The *Ross* court stated: "Expert testimony was not required because the cause of [the victim's] trauma was clear." Id.

As in *Ross*, the cause of M's trauma was clear— the presence of the defendant during her testimony. M broke down on the stand and told two witnesses that she was unable to continue with the defendant in the room. It is not likely that expert testimony would have changed the court's decision. On the basis of our review of the record, we conclude that the court did not abuse its discretion and properly denied the defendant's motion for a court-ordered expert evaluation of M's ability to testify in the defendant's presence.

### D

The defendant next claims that the trial court improperly denied his motion for a mistrial. We disagree.

"The decision as to whether to grant a motion for a mistrial . . . is one that requires the trial court to exercise its judicial discretion. . . . Our review of the trial

---

[10] Minn. Stat. § 595.02 (4) (a) provides in relevant part: "In a proceeding in which a child less than 12 years of age is alleging, denying, or describing:

"(1) an act of physical abuse or an act of sexual contact or penetration performed with or on the child or any other person by another . . . the court may, upon its own motion or upon the motion of any party, order that the testimony of the child be taken in a room other than the courtroom or in the courtroom and televised at the same time by closed-circuit equipment, or recorded for later showing to be viewed by the jury in the proceeding, to minimize the trauma to the child of testifying in the courtroom setting and, where necessary, to provide a setting more amenable to securing the child witness's uninhibited, truthful testimony."

court's exercise of its discretion is limited to questions of whether the court correctly applied the law and could reasonably have concluded as it did. . . . Every reasonable presumption will be given in favor of the trial court's ruling. . . . It is only when an abuse of discretion is manifest or where an injustice appears to have been done that a reversal will result from the trial court's exercise of discretion." (Internal quotation marks omitted.) *State* v. *Lasky*, 43 Conn. App. 619, 635, 685 A.2d 336 (1996), cert. denied, 239 Conn. 959, 688 A.2d 328 (1997).

1

The defendant first claims that § 54-86g provides only for a pretrial hearing. The defendant's argument is without merit. The language of § 54-86g does not state that the *Jarzbek* hearing must be completed before trial or even before testimony begins.[11] The statute provides only that before a witness' testimony can be videotaped outside the defendant's presence, the court must make the findings of fact required by § 54-86g.

2

The defendant next claims that the switch from live to videotaped testimony impinged on his right to be presumed innocent until proven guilty beyond a reasonable doubt. "The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies

---

[11] The defendant cites several cases that concern pretestimony determinations. None, however, limits the language of § 54-86g to require that the hearing be held prior to a witness taking the stand. The reason that those cases do not deal with a midtestimony request pursuant to § 54-86g, is that that situation was not before those courts. See *State* v. *Marquis*, supra, 241 Conn. 823; *State* v. *Spigarolo*, supra, 210 Conn. 361; *State* v. *Snook*, 210 Conn. 244, 251, 555 A.2d 390, cert. denied, 492 U.S. 924, 109 S. Ct. 3258, 106 L. Ed. 2d 603 (1989) (refusing to rewrite § 54-86g); *State* v. *Bonello*, supra, 210 Conn. 53; *State* v. *Darby*, 19 Conn. App. 445, 447, 563 A.2d 710, cert. denied, 213 Conn. 801, 567 A.2d 833 (1989).

at the foundation of the administration of our criminal law." *Coffin* v. *United States*, 156 U.S. 432, 453, 15 S. Ct. 394, 39 L. Ed. 481 (1895). The defendant claims that the removal of M from the stand, the videotaping of her testimony and the playing of the videotape for the jury effectively branded him with an unmistakable mark of guilt. It is well settled in both the federal system and in Connecticut that certain nonevidentiary factors can erode the presumption of innocence. See *Estelle* v. *Williams*, 425 U.S. 501, 504, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976) (requiring defendant to wear identifiable prison clothing at trial possible impairment on presumption of innocence); see also *State* v. *Webb*, 238 Conn. 389, 454, 680 A.2d 147 (1996) (while right to appear unfettered is important, it is not absolute).

The present case, however, is not one in which the defendant was "branded" with guilt. The videotaping of M's testimony took place out of the jury's presence. The videotape focused on M during her testimony and did not reveal that the defendant was not in the same room. Before the videotape was played to the jury, in fact, the court and the parties ensured that the voice identifications on the videotape were not played to the jury. The jury had no way of knowing who, aside from M and the two attorneys, was in the room. The defendant argues that the only inference the jury could draw was that the defendant was absent. The prosecution argues that the jury just as reasonably could have inferred that the defendant was present.[12] The court, prior to the jury's viewing of the videotape, made no reference to

---

[12] The defendant cites to law review articles that suggest that videotaping a witness' testimony automatically deprives the defendant of his presumption of innocence. We note that the defendant does not cite any cases to support this proposition. We do not find the articles to be persuasive. See, e.g., R. Kohlmann, "The Presumption of Innocence: Patching the Tattered Cloak After *Maryland* v. *Craig*," 27 St. Mary's L.J. 389, 420 (1996) ("use of alternative forms of testimony casts doubt on the presumption of innocence at the critical moment when the State's key witness takes the stand").

the defendant's presence in or absence from the room while M was videotaped. The court told the jury only that "she broke down and we could not continue with her testimony before you. We have arranged to have her testimony videotaped, the balance of her testimony." Aside from the inference that the defendant asserts, he is unable to provide us with reasons why the jury would have presumed that he was guilty prior to its deliberations. We will not speculate as to what inferences the jury did or did not draw. Absent evidence to the contrary, the jury is presumed to have acted properly. See *State* v. *Sauris*, 227 Conn. 389, 403, 631 A.2d 238 (1993). We conclude that the midtestimony videotaping of M's testimony did not deprive the defendant of the presumption of innocence in violation of his constitutional rights.

3

The defendant next claims that the videotaped portions of M's testimony prejudicially bolstered the previous testimony she gave in court. This claim lacks merit. After comparing M's testimony in the presence of the defendant with her videotaped testimony, we conclude that any portions that were repetitious did not unfairly bolster her testimony. We conclude that the court, in the circumstances of this case, did not abuse its discretion in denying the defendant's motion for a mistrial.

II

The defendant next claims that the trial court (1) improperly precluded six defense character witnesses who were not disclosed prior to trial from testifying because their testimony was irrelevant, (2) abused its discretion under former Practice Book § 743 (4), now § 40-13 (d),[13] and (3) violated the defendant's right to

___

[13] Practice Book § 743 (4), now § 40-13 (d), provides: "No witness shall be precluded from testifying for any party because his or her name or statement or criminal history was not disclosed pursuant to this rule if the party calling such witness did not in good faith intend to call the witness at the time that he or she provided the material required by this rule. In

compulsory process in violation of the federal[14] and state[15] constitutions. We decline to review the defendant's claims because he failed to provide us with an adequate record to review.

A

The defendant claims that his witnesses would have testified as to his tendency for being nonviolent and truthful. The court appears to have precluded the proposed witnesses' testimony on the ground that it was not relevant.

The following portion of the transcript is relevant to this claim.

"[Prosecution]: Your Honor, I have an objection to this additional witness list that I just received this morning. It indicates six new additional witnesses. The state, many, many months ago, asked for the defense to provide a witness list.

"The Court: I didn't see that. There's a list of new— a list of new witnesses?

"[Prosecution]: And now, well into this trial process, the state's being provided with six additional new witnesses, none of whom I can imagine has any relevant information whatsoever about this case. I would ask that the witnesses be stricken and not allowed to testify in this matter.

"The Court: [Defense Counsel], what's the rationale for the witnesses?

the interests of justice *the judicial authority may in its discretion* permit any undisclosed individual to testify." (Emphasis added.)

[14] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to . . . have compulsory process for obtaining witnesses in his favor . . . ."

[15] Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right to . . . have compulsory process to obtain witnesses in his behalf . . . ."

"[Defense Counsel]: Your Honor, that motion was made in good faith—this was made in good faith. What transpired over the weekend was that I consulted with other attorneys who have experience in trying this type of case. They indicated to me that they found it advantageous to present evidence concerning character traits of the defendant. . . . [T]hese do not involve witnesses who speak directly concerning the event. They're merely witnesses that may be called as to the character trait of my client, and I would ask the court to permit me to present those witnesses . . . .

\* \* \*

"[Prosecution]: I think it's unfair that just because defense counsel is now seeking advice from other attorneys when we're in the middle of trial that he now decides it's important that he list character witnesses. It's something he could have done inside his forty-five day window [under § 743] to respond to me with possible witnesses in the case. It's not as if all of a sudden something new has developed and there is a material witness to the crime that he's just learned about. These are people that are character witnesses. . . .

"The Court: That's the problem. You've got six witnesses here and you want to bring them in without giving the state, I think, ample opportunity or an appropriate opportunity to investigate who they are and their backgrounds and to counteract that. This is something that should have been—this is not in the way of rebuttal witnesses who can testify as to something that might have happened during trial. This is a new strategy that you just determined that you wanted to employ. I think these witnesses probably should have been disclosed prior to trial. I just don't think it's appropriate.

"[Defense Counsel]: Well, could I put on the record that I did make a motion for accelerated rehabilitation prior to this trial, and I presented to Judge Rittenband

a number of letters. Many of the letters [were from others besides] these six people. So, the state was aware that these people would vouch for the defendant. . . . They've had some disclosure of people in the community who had attested to his good character.

"The Court: There's certainly a big difference between a hearing for accelerated rehabilitation [and a trial]. You don't have examination of witnesses. At least, I assume these witnesses were not cross-examined and they were simply presented to the court for its consideration—I mean, the letters were presented, so there is a difference, certainly a big difference.

"[Defense Counsel]: That's correct. I can tell you that this is the first trial that I've had under the new Practice Book, and previously we've not had to disclose witnesses to the state. But I did disclose all the witnesses that I had concerning the events in question. I'm now today presenting—suggesting that I may wish to present other witnesses concerning the character trait of my client. The state is still presenting its case. I don't know how long it's going to take to present its case, but it certainly has a few days to investigate, if not a week to investigate these people. These are people in the community who've known my client for many years.

"The Court: What character trait are they going to testify to?

"[Defense Counsel]: The truthfulness and also the trait of violence or nonviolence.

"[Prosecution]: That trait is not a relevant character trait in this case.

"The Court: That's not an issue in this case. Under those circumstances, I'm not persuaded that that additional witness list should be granted or that permission to call these witnesses should be granted at this late date. I'm going to deny that request, too."

It is axiomatic that for evidence to be admissible it must be relevant. "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue." (Internal quotation marks omitted.) *First Federal Bank, FSB* v. *Gallup*, 51 Conn. App. 39, 41, 719 A.2d 923 (1998). "To be admissible, the character evidence that a defendant seeks to introduce must be limited to specific traits and relevant to the offense charged. . . . The determination of relevance must be made according to reason and judicial experience. . . . That determination requires the exercise of the court's discretion."[16] (Citations omitted; internal quotation marks omitted.) *State* v. *Shehadeh*, 52 Conn. App. 46, 51, 725 A.2d 394 (1999). In cases involving claims of improper evidentiary rulings, our standard of review is limited to a determination of whether the court abused its discretion. *State* v. *Coleman*, 241 Conn. 784, 789, 699 A.2d 91 (1997). It is, however, the appellant's duty to provide us with an adequate record to review. Practice Book §§ 60-5 and 61-10; *Chase Manhattan Bank/City Trust* v. *AECO Elevator Co.*, 48 Conn. App. 605, 607, 710 A.2d 190 (1998). The defendant failed to provide us with an adequate record.

The transcript reveals only that the court stated: "That's not an issue in this case. Under those circumstances, I'm not persuaded that that additional witness list should be granted or that permission to call these witnesses should be granted at this late date. I'm going to deny that request, too." There is no additional discussion by the court as to its reasons for denying the

---

[16] When the defendant made his request on September 17, 1996, he was charged with sexual assault in the first degree in violation of General Statutes § 53a-70, sexual assault in the fourth degree and risk of injury to a child. The state, on September 26, 1996, filed an amended information charging him with only sexual assault in the fourth degree and risk of injury to a child. While the defendant sought to introduce the character trait of nonviolence into evidence, he also sought to introduce the character trait of truthfulness. The defendant made no further offer of proof disclosing which character trait each of the proposed witnesses might have testified to.

defendant's request to present additional character witnesses. The defendant did not file a motion for articulation pursuant to Practice Book § 66-5, although the file reveals that he did file three motions for extensions of time to file a motion for articulation or rectification.

The defendant claims that there is an adequate record to review because of the lengthy colloquy between the parties and the court. The defendant points to the court's concern over the fact that the defendant did not disclose the witnesses prior to trial. Our review of the transcript, however, does not unambiguously reveal that the court based its determination on the defendant's nondisclosure. The defendant further argues that the court determined that the proffered character traits were not relevant. While that is a reasonable inference, we do not believe that the record is clear enough for us to make that determination. "Our role is not to guess at possibilities, but to review claims based on a complete factual record developed by a trial court. . . . Without the necessary factual and legal conclusions furnished by the trial court . . . any decision made by us respecting [the defendant's claims] would be entirely speculative." (Internal quotation marks omitted.) *State v. Combs*, 51 Conn. App. 700, 701–702, 725 A.2d 349 (1999). Because we have not been provided with the court's factual or legal basis for its ruling, we cannot determine whether the court acted properly.

B

The defendant next claims that the trial court abused its discretion under former Practice Book § 743 (4) in precluding the undisclosed witnesses. Because the defendant did not provide us with an adequate record to review, we decline to review this claim.

C

The defendant next claims that the trial court's preclusion of his character witnesses violated his state and

federal constitutional rights to compulsory process. The defendant claims that he is entitled to review of this unpreserved claim pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[17]

Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original.) Id., 239–40.

As we stated in part II A, the defendant has failed to provide us with an adequate record. The defendant, therefore, has failed to meet the first prong of *Golding*.

---

[17] The defendant also seeks plain error review pursuant to Practice Book § 60-5. Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. *The court may* in the interests of justice notice plain error not brought to the attention of the trial court. . . ." (Emphasis added.) "To prevail under the plain error doctrine, the defendant must demonstrate that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice. . . . This doctrine is not implicated and review of the claimed error is not undertaken unless the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *McDuffie*, 51 Conn. App. 210, 216–17, 721 A.2d 142 (1998), cert. denied, 247 Conn. 958, 723 A.2d 814 (1999). To be afforded plain error review, however, the defendant must provide this court with an adequate record, which, as we concluded in part II A, he did not.

Accordingly, we decline to discuss his constitutional claims.[18]

### III

The defendant next claims that the trial court improperly denied his motion to redact a portion of the 1994 videotaped session between M and Edell. We disagree.

Because this is a claim of evidentiary error, our standard of review is limited to whether the court abused its discretion. *State* v. *Hoth*, 50 Conn. App. 77, 87, 718 A.2d 28, cert. denied, 247 Conn. 922, 722 A.2d 811 (1998).

At trial, the defendant claimed that the videotaped session had to be redacted to conform to the constancy of accusation doctrine of *State* v. *Troupe*, 237 Conn. 284, 677 A.2d 917 (1996). The defendant now, for the first time on appeal, essentially argues that portions of the videotape allege uncharged misconduct on his part. The crux of the defendant's claim is that M states on the videotape that the alleged sexual abuse occurred "two times," "three times" and "more and more and more." At trial, however, M's testimony indicated a single touching on one day. The defendant did not raise the uncharged misconduct issue at trial as an objection to the videotape's admission. Instead, he relied solely on *Troupe*.[19] On appeal, "we will not review an evidentiary

[18] While we do not review the defendant's federal or state constitutional claims, we note *with satisfaction* that the defendant properly briefed his state constitutional claim by utilizing the six analytical tools set forth in *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992), and required by *State* v. *Joyce*, 229 Conn. 10, 16–17 n.7, 639 A.2d 1007 (1994).

[19] The following colloquy took place regarding the admission of the videotape.

"[Defense Counsel]: I assume the state is offering it under the constancy of accusation, and I'm assuming that under the *Troupe* case there's certain statements of [M] that are admissible [such as] her report of a touching by my client, where and when, but particular information I'm claiming is not part of constancy of accusation because there was no accusation made on direct examination by [M] and it goes into a detail that is not admissible.

"The Court: The detail being the number of times?

"[Defense Counsel]: Yes.

"The Court: I'm not sure that's a detail of what happened, or a description

claim not raised below. Once counsel states the authority and ground of his objection, any appeal will be limited to the ground asserted." (Internal quotation marks omitted.) *State* v. *Alvarez*, 216 Conn. 301, 306, 579 A.2d 515 (1990). Because the defendant failed to raise the uncharged misconduct issue at trial and the court did not have the opportunity to consider that ground for redacting the videotape, we will not address this claim on appeal. Instead, we limit our discussion to the constancy of accusation doctrine of *Troupe*.[20]

---

of what happened. I think the *Troupe* case is an effort made to limit the description of the incident, not as to the numbers of times. I don't think that's a requirement of *Troupe*.

"[Prosecutor]: Your Honor, the state's not offering it under *Troupe*. I mean [M] didn't even testify that she told what happened to her to [Edell]. The agreement was that we were stipulating to the videotape. I'm not attempting to offer it under any type of particular hearsay exception or under any case law. We just agreed that it was coming [into evidence]. That was the bottom line.

"The Court: Well, you did stipulate. I mean, you still want the videotape to come in, at least those portions of it?

"[Defense Counsel]: Yes, Your Honor.

"The Court: All right.

"[Defense Counsel]: And I did agree, but that was after I heard [M] on the witness stand and heard when she said, 'I don't remember how many times,' I don't think that—there was no accusation there that it happened more than once. Therefore, I don't think that that part of the videotape should be included.

"[Prosecutor]: Your Honor, we were also discussing in chambers yesterday the admission of the videotape and stipulating to it, and that was several days after [M] had given her testimony. So, obviously, [defense counsel] knew yesterday afternoon what [M] had testified to.

"The Court: Well, there was a stipulation that the videotape be shown. At the last moment here, you're concerned about the number of times. [M] didn't say it didn't happen more than once either. She said she didn't know.

"[Defense Counsel]: Doesn't remember.

"The Court: Doesn't remember.

"[Defense Counsel]: So there was no affirmative accusation that it did happen more than once.

"The Court: Well, I think that if the videotape is going to be shown by stipulation, then the entire videotape should be shown, which was your agreement. I'll deny your request to edit the videotape."

[20] The dissent characterizes our holding in part III as an expansion of the constancy of accusation doctrine of *State* v. *Troupe*, supra, 237 Conn. 284.

Our Supreme Court limited the constancy of accusation doctrine in *State* v. *Troupe,* supra, 237 Conn. 304, holding that "a person to whom a sexual assault victim has reported the assault may testify only with respect to the fact and timing of the victim's complaint; any testimony by the witness regarding the details surrounding the assault must be strictly limited to those necessary to associate the victim's complaint with the pending charge, including, for example, the time and place of the attack or the identity of the alleged perpetrator. . . . Thus, such evidence is admissible only to corroborate the victim's testimony and not for substantive purposes."

The 1994 videotape was presented after M testified in court that she had been abused by the defendant. The transcript of the videotaped session that the jury viewed reveals that M disclosed to Edell that she had been assaulted by the defendant. Nothing in the videotape indicates that the evidence admitted exceeds what is permissible under the constancy of accusation doctrine set forth in *Troupe.* We note, moreover, that the defendant originally had stipulated to the admission of the videotape in its entirety. It was only after inconsistencies between M's testimony and the videotape arose

---

We respectfully disagree. In constancy of accusation cases, the underlying statement to be admitted is always a statement from the victim. In most cases, the victim tells somebody about the crime, and the confidant then testifies as to what the victim told her. In the present case, M told Edell about being assaulted. The state, instead of offering Edell's testimony describing M's statements, avoided the problems inherent in hearsay testimony by offering the videotape of the session where M told Edell that she had been assaulted.

The spirit of *Troupe* was followed by the trial court. M had testified and had been subject to cross-examination. Id., 293. Only after that took place did the state offer the videotaped session with Edell The videotape of M's session with Edell consisted solely of corroborative evidence. We cannot emphasize enough that if there are inconsistencies between previous statements made by a victim and the victim's testimony, those inconsistencies go to the victim's credibility, which is solely the function of the jury to evaluate.

that the defendant objected. It is axiomatic that inconsistencies in victims' statements affect the credibility, not the admissibility, of the evidence. The credibility of witnesses is solely within the province of the jury to determine. *State* v. *Knight*, 50 Conn. App. 109, 112, 717 A.2d 274 (1998). We conclude, therefore, that the court properly denied the defendant's motion to redact the videotaped session between M and Edell.

The judgment is affirmed.

In this opinion LANDAU, J., concurred.

LAVERY, J., dissenting. I respectfully disagree with the majority's conclusion that the trial court properly denied (1) the defendant's request for a brief continuance to prepare for an evidentiary hearing pursuant to *State* v. *Jarzbek*, 204 Conn. 683, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988), on the state's motion to videotape M's testimony, (2) his motion for a court-ordered examination of M to determine whether she was capable of completing her testimony in his presence and (3) his motion to redact portions of a previously videotaped interview of M.

I

A careful examination of the record discloses that the trial court's denial of the defendant's request for a brief continuance deprived him of his constitutional right to the effective assistance of counsel and also may have infringed on his constitutional right of confrontation.

"[T]he trial court's discretion in granting or denying a request for a continuance should be exercised to accomplish the ends of substantial justice. *State* v. *Battle*, 170 Conn. 469, 476, 365 A.2d 1100 (1976)." *State* v. *Hamilton*, 30 Conn. App. 68, 83, 618 A.2d 1372 (1993), aff'd, 228 Conn. 234, 636 A.2d 760 (1994). In determining

whether the court's denial of the request for a continuance was improper, the majority properly observes that the following factors guide our review: "the timeliness of the request for continuance; the likely length of the delay; the age and complexity of the case; the granting of other continuances in the past; the impact of delay on the litigants, witnesses, opposing counsel and the court; the perceived legitimacy of the reasons proffered in support of the request; the defendant's personal responsibility for the timing of the request; [and] the likelihood that the denial would substantially impair the defendant's ability to defend himself . . . ." *State v. Hamilton*, 228 Conn. 234, 240, 636 A.2d 760 (1994).

Application of those factors to the record discloses that the court improperly denied the defendant's request for a continuance. First, the request was timely. The defendant received a copy of the state's *Jarzbek* motion at approximately 1:57 p.m. on Friday, September 13, 1996, and requested a continuance when the court reconvened shortly after 2 p.m. Second, the length of the continuance was minimal and constituted the least amount of time feasible to enable defense counsel to prepare adequately for the evidentiary hearing. Defense counsel requested a continuance until the following Tuesday, which was the next regularly scheduled court session.[1] Third, the defendant did not seek nor was he afforded any previous continuances in connection with the *Jarzbek* proceeding. Fourth, a continuance from late Friday afternoon until the following Tuesday morning would not have adversely impacted the court, the state, M or any witnesses. Nor did the state articulate what advantage, if any, would be gained by conducting the hearing on Friday afternoon as opposed to the following Tuesday morning.

---

[1] In a colloquy with the court, defense counsel stated: "The issue is to be prepared for this evidentiary hearing, and I'm asking for—it's now Friday afternoon. I guess I'm just asking [for time until] the next court session to prepare."

Fifth, the defendant proffered several legitimate reasons in support of his request. After consulting M's therapist, the state had informed defense counsel well in advance of the trial that it would not file a *Jarzbek* motion, and defense counsel was entitled reasonably to rely on that representation. On September 13, 1996, however, without any prior notice, the state filed a request to videotape M's testimony after M had already given extensive testimony on direct examination. In light of the serious consequences that that motion, if granted, imposed on the defendant, including the potential impact on his constitutional right to face-to-face confrontation, defense counsel properly requested a brief continuance so that he could prepare adequately for the evidentiary hearing. Defense counsel claimed that a brief continuance was necessary so that he could, inter alia, conduct legal research and determine whether to utilize expert testimony.

Sixth, neither defense counsel nor the defendant were responsible for the timing of the request. The state filed this motion because, just prior to the luncheon recess, M experienced difficulties during the prosecutor's direct examination. Defense counsel did not precipitate the state's motion by, inter alia, aggressively cross-examining or intimidating M. The record neither discloses, nor does the state claim, that M was unable to testify in the defendant's presence because the defendant had previously threatened or intimidated M or her family. The timing of the defendant's request was directly influenced by and was a direct consequence of the timing of the state's motion.

Last, the court's denial of the request substantially impaired the defendant's ability to defend himself. The *Jarzbek* hearing implicated the defendant's constitutional right to face-to-face confrontation. See *Coy* v. *Iowa*, 487 U.S. 1012, 1016, 108 S. Ct. 2798, 101 L. Ed. 2d 857 (1988) ("the Confrontation Clause guarantees

the defendant a face-to-face meeting with witnesses appearing before the trier of fact"); see also *State* v. *Bonello*, 210 Conn. 51, 56, 554 A.2d 277, cert. denied, 490 U.S. 1082, 109 S. Ct. 2103, 104 L. Ed. 2d 664 (1989) (*Jarzbek* hearing requires court to " 'balance the individual defendant's right of confrontation against the interest of the state in obtaining reliable testimony from the particular minor victim in question' "). Therefore, "[i]f the defendant is entitled to a hearing on the state's motion for videotaped testimony, he is entitled to have the trial court ensure that such a hearing is *meaningful* because, as we recognized in *Jarzbek*, the hearing on the motion serves to protect the right of an accused to confront witnesses against him as guaranteed by the confrontation clause of both the federal and state constitutions." (Emphasis added; internal quotation marks omitted.) *State* v. *Marquis*, 241 Conn. 823, 837, 699 A.2d 893 (1997).

The *Jarzbek* hearing implicated the defendant's constitutional right of confrontation, and he could not adequately protect this right unless he received effective assistance of counsel at the hearing. In light of the court's denial of the request for a brief continuance, I respectfully disagree with the majority's conclusion that a defense attorney, who was neither provided with advance notice of the state's *Jarzbek* motion nor afforded a meaningful opportunity to conduct legal research, develop legal strategy and determine whether to utilize expert testimony, could have adequately protected his client's right of confrontation during a *Jarzbek* hearing. Thus, the court's denial of the request for a continuance deprived the defendant of his right to the effective assistance of counsel and also may have infringed on his constitutional right of confrontation.

I also respectfully disagree with the majority's conclusion that the defendant was not prejudiced by the court's denial of the request for a continuance solely

because defense counsel failed to inform the court specifically that the denial of this request could infringe on the defendant's constitutional rights to the effective assistance of counsel and confrontation. Defense counsel's failure to articulate this concern to the court did not negate any actual prejudice suffered by the defendant. In reviewing the propriety of a court's denial of a request for a continuance, "an appellate court should limit its assessment of the reasonableness of the trial court's exercise of its discretion to a consideration of those factors, on the record, that were presented to the trial court, *or of which that court was aware*, at the time of its ruling on the motion for a continuance." (Emphasis added.) *State* v. *Hamilton*, supra, 228 Conn. 242. It is reasonable to assume that the court was aware that the *Jarzbek* hearing implicated the defendant's right of confrontation and that a denial of the request for a continuance implicated the defendant's right to the effective assistance of counsel.

I also respectfully disagree with the majority's conclusion that the trial court's denial of the request for a continuance did not prejudice the defendant. This conclusion is predicated on the improper assumption that no amount of preparation would have enabled defense counsel to persuade the court to deny the state's *Jarzbek* motion, as well as on the court's statement, made prior to the presentation of any evidence, that the outcome of the *Jarzbek* hearing was a foregone conclusion.[2]

---

[2] The following colloquy between the court and defense counsel, in which defense counsel requested a brief continuance, casts doubt on whether the defendant received a meaningful *Jarzbek* hearing and intimates that the outcome of this hearing was a foregone conclusion:

"[Defense Counsel]: And I would move again for a continuance until Tuesday. It is 2:30 on Friday afternoon. The next court session, jury session, will be Tuesday. I'm asking for a continuance of this matter until 10 a.m. so I can better prepare for this hearing and prepare any motions that I feel [are] appropriate.

"The Court: Again . . . the motion is based on events that transpired here in the courtroom this morning earlier, and it appears to the court that

## II

A careful examination of the record also discloses that the trial court improperly denied the defendant's request for a court-ordered examination of M to determine whether she was capable of completing her testimony in his presence.

"[I]n criminal prosecutions involving the alleged sexual abuse of children of tender years, the practice of videotaping the testimony of a minor victim outside the physical presence of the defendant is, in appropriate circumstances, constitutionally permissible. [The] holding that appropriate circumstances may warrant a departure from strict compliance with confrontation requirements does not, however, signal a relaxation of the underlying evidentiary requirement that appropriate circumstances be proven to exist. . . .

"[A] trial court must determine, at an evidentiary hearing, whether the state has demonstrated a compelling need for excluding the defendant from the witness room during the videotaping of a minor victim's testimony. In order to satisfy its burden of proving compelling need, the state must show that the minor victim would be so intimidated, or otherwise inhibited, by the physical presence of the defendant that the trustworthiness of the victim's testimony would be seriously called into question. Furthermore, the state bears the burden of proving such compelling need by clear and convincing evidence. . . . [I]n light of the constitutional right of confrontation at stake here, the primary focus of the trial court's inquiry must be on the reliability of the minor victim's testimony, not on the injury that the victim may suffer by testifying in the presence of the accused." (Citations omitted.) *State* v. *Jarzbek*, supra,

the issues are quite simple. . . . [B]ut to continue the case until Tuesday just to hear this motion, I'm not sure would serve any useful purpose. It doesn't seem to the court that it could serve any useful purpose."

204 Conn. 704–705; see *State* v. *Marquis*, supra, 241 Conn. 834.

By requesting permission to videotape M's testimony outside the presence of the defendant, the state called into question M's ability to testify reliably in a formal courtroom setting and in the presence of the defendant. Because the state petitioned the court to utilize this procedure, it was reasonable for the defendant to request a court-ordered examination to determine whether M was capable of completing her testimony in his presence. Although a court is not required to order such an examination whenever it conducts a *Jarzbek* hearing, in light of the specific factual circumstances presented by this case, I respectfully submit that the court's denial of the request was improper.

M's father and Linda Heslin, the victim's advocate, testified that M was apprehensive about continuing her testimony in the presence of the defendant, and they believed that M would be better able to testify out of his presence. Prior to the state's request for a *Jarzbek* hearing, however, M's therapist concluded that M was capable of testifying reliably in the defendant's presence. Moreover, the record discloses that M offered extensive testimony on direct examination in the defendant's presence before she experienced difficulty. In light of this conflicting evidence, a court-ordered examination by an expert would have provided an objective assessment of M's ability to testify reliably, information that was highly relevant to the court's determination as to whether the state had satisfied its burden of proving by clear and convincing evidence "that the minor victim would be so intimidated, or otherwise inhibited, by the physical presence of the defendant that the trustworthiness of the victim's testimony would be seriously called into question." (Internal quotation marks omitted.) *State* v. *Marquis*, supra, 241 Conn. 834.

## III

An examination of the record also discloses that the trial court improperly denied the defendant's motion to redact portions of a 1994 videotaped interview of M. The court improperly concluded that the challenged portions of that videotape were admissible pursuant to the constancy of accusation doctrine.

On September 13, 1996, M testified on direct examination as to a single incident of improper touching by the defendant. When the prosecutor asked M, "Do you remember if [the defendant] touched your private one time or more than one time?" M responded, "I can't remember." On or about November 22, 1994, Diane Edell had videotaped her interview of M. Edell was the program coordinator and interviewer at the child abuse diagnostic center at Saint Francis Hospital and Medical Center. The state sought to present that videotaped interview to the jury. On September 18, 1996, defense counsel moved to redact those portions of the videotape in which M stated that the defendant had sexually assaulted her on several other occasions. Defense counsel claimed that the challenged portions of the videotape constituted hearsay and were not admissible pursuant to the constancy of accusation doctrine. The court denied the motion. The state did not proffer any alternative basis for admitting the challenged portions of the videotape.

"[A] person to whom a sexual assault victim has reported the assault may testify only with respect to the fact and timing of the victim's complaint; any testimony by the witness regarding the details surrounding the assault must be strictly limited to those necessary to associate the victim's complaint with the pending charge, including, for example, the time and place of the attack or the identity of the alleged perpetrator.

. . . Thus, such evidence is admissible only to corroborate the victim's testimony and not for substantive purposes. Before the evidence may be admitted, therefore, the victim must first have testified concerning the facts of the sexual assault and the identity of the person or persons to whom the incident was reported. In determining whether to permit such testimony, the trial court must balance the probative value of the evidence against any prejudice to the defendant." *State* v. *Troupe*, 237 Conn. 284, 304–305, 677 A.2d 917 (1996) (en banc). "[C]onstancy of accusation evidence is not admissible unless the victim has testified, and is subject to cross-examination, concerning the crime and the identity of the person or persons to whom the victim has reported the crime . . . ." (Citations omitted.) Id., 293.

Several factors establish that the court improperly admitted the challenged portions of the videotape under the constancy of accusation doctrine. First, *Troupe* authorizes the "*person to whom a sexual assault victim has reported the assault [to] testify* only with respect to the fact and timing of the victim's complaint . . . ." (Emphasis added.) Id., 304. *Troupe* did not explicitly authorize the trial court to admit a videotaped interview of the victim in which the victim herself testifies as to the sexual assault, as opposed to merely allowing the counselor who received the victim's complaint to testify as to the fact and timing of the complaint. The majority today expands the constancy of accusation doctrine to permit the admission of testimony by a victim herself, as opposed to merely admitting the corroborative testimony of the person to whom a victim issued her complaint.

Second, the constancy of accusation doctrine provides that "such evidence is admissible only to *corroborate* the victim's testimony and not for substantive purposes." (Emphasis added.) Id. In the present case, however, M never testified on direct examination as to

multiple incidents of sexual assault. Because M testified only as to one incident of sexual assault, *Troupe* does not permit the court to admit evidence that M informed Edell that the defendant had sexually assaulted her on several other occasions. Moreover, the challenged portions of the videotape were neither relevant to the fact and timing of M's complaint as to the single incident of sexual assault, nor were they necessary to associate M's complaint with the pending charge. Last, there is no indication in the record that the court "balanc[ed] the probative value of the evidence against any prejudice to the defendant." Id., 305.

I respectfully disagree with the majority's conclusion that defense counsel's failure to challenge the admission of portions of the 1994 videotape until after M had completed her testimony, but before this videotape was shown to the jury, undermines the strength of defense counsel's objection or, in the alternative, serves as an independent justification for admitting the videotape in its entirety. The victim must first testify as to certain matters before the court can determine whether to admit constancy of accusation evidence. Constancy of accusation "evidence is admissible only to corroborate the victim's testimony and not for substantive purposes. Before the evidence may be admitted, therefore, the victim must first have testified concerning the facts of the sexual assault and the identity of the person or persons to whom the incident was reported." Id., 304–305. If the court cannot determine whether proposed constancy of accusation evidence is admissible until after the victim has completed her testimony, it follows that defense counsel cannot properly determine whether to object to the admission of such evidence until the victim has testified. Defense counsel could not, therefore, determine whether it was necessary to object to the admission of any portion of the videotape until after M had completed her testimony.

The court's admission of the challenged portions of the 1994 videotape substantially prejudiced the defense. M's testimony in court was limited to one incident of improper touching, and in connection with this incident the state charged the defendant with one count of sexual assault in the fourth degree and one count of risk of injury to a child. In defense to this single allegation, the defendant claimed that on the day in question, while he was sleeping, M had grabbed his fingers and he awoke to find M stimulating herself with his fingers. The defense theory was consistent with the testimony given by a state's witness, Elaine Yordan, a physician, that M masturbated.[3] The admission of the challenged portions of the videotape, wherein M claimed that the defendant had sexually assaulted her on several other occasions,[4] substantially undermined the defendant's

---

[3] On cross-examination, defense counsel and Yordan engaged in the following colloquy:

"Q. Did you also obtain a history of the child relating to her itching?

"A. Yes.

"Q. And, in fact, that history included a report that she itches down there a lot?

"A. Yes.

"Q. And what did you understand that to mean, 'down there a lot?' What does that mean? What did that mean to you as you took the history?

"A. Itching of the external genitalia a lot.

"Q. And did you inquire as to—in obtaining this history, this medical history, did you determine what a lot meant?

"A. No.

"Q. Now, did you also inquire in obtaining your history as to masturbation by M?

"A. I don't recall whether I asked [her] mother directly the question or [whether] she volunteered the information.

"Q. But as part of the history, you obtained information concerning M's masturbating?

"A. Yes.

"Q. And the history was that M in fact masturbates?

"A. Yes.

"Q. And also that M masturbates, that was not something new?

"A. Correct."

[4] During the videotaped interview, Edell and M engaged in the following colloquy:

claim that the single incident of improper touching was inadvertent.

For all of the foregoing reasons, I would reverse the judgment and remand the case for a new trial.

"Q. Do you think that [the defendant] touched your pee-pee only two times or more than two times?

"Q. Do you think that it was two times? Do you think that it was three times?

"A. Three times.

\* \* \*

"Q. Uh-huh. Did he ever touch you when you were in your house?

"A (Shakes her head no).

"Q. Uh-uh? Just in his house?

"Q. Okay. Now I have to make one thing really sure, okay? This is a very important question. Now, I know you're getting tired of talking about this, okay, so we'll be finished in just a few minutes. I promise. You told me before, I said to you, did [the defendant] touch your pee-pee just one time or was it more than one time?

"A. More and more and more and more."